## Case No. 5,754.

### GREEN v. The CITY OF BRIDGETON.

[9 Cent. Law J. 206; 20 Alb. Law J. 257.] [1]

District Court, S. D. Georgia. May, 1879.

CIVIL RIGHTS—COMMON CARRIERS — REASONABLE REGULATIONS—CASE IN JUDGMENT.

1. Congress has enacted no law which forbids inter-state common carriers by water or land from regulating the business of their vessels or vehicles in such manner that the accommodations for colored passengers and their respective conveyances may be distinct and separate from those assigned to white passengers. Colored persons are, however, entitled to accommodations as suitable as those designated for the exclusive use of white passengers.

[1] [Reprinted from 9 Cent. Law J. 206, by permission. 20 Alb. Law J. 257, contains only a partial report.]

2. The libellant, a colored woman, went on board a steamboat and took her position as a passenger on the upper deck aft, a portion of the boat assigned to the exclusive use of white passengers. She was directed by one of the officers of the boat to the cabin on the lower deck, a place affording substantially the same accommodations as the place where she now was, but designed especially for colored people. She refused to do so, and tendered the customary fare, which was declined. Having been threatened that she would be put off the boat at the next landing place if she persisted in remaining where she was, she voluntarily left the boat at such landing place. *Held*, that she had no cause of action for such exclusion.

In admiralty.

ERSKINE, District Judge. The libellant states that the steamboat, City of Bridgeton, in September, 1878, the time of the alleged tort, was a common carrier of freight and passengers for hire, at certain specified rates, between the city of Savannah and Palatka, in the state of Florida, and intermediate points, including the port of Darien, in this district; that said steamboat being at the wharf of Darien, and libellant desiring to go to Savannah, went on board, carrying with her a three-year-old child, her nephew, and took her position as a passenger, with said child, on the upper deck aft, which was the only place or portion of the steamboat having any comforts or conveniences for passengers; that those who were willing to travel without the usual comforts and conveniences, were transported on the lower deck, but that said place was unfit for libellant and child; that some time after leaving the wharf the purser of the steamboat came to libellant, and declining to take any passage money from her, directed her to go to the lower deck, and, on her declining to do so, he informed her that he would put her off at Doboy wharf, to which place the said steamboat was drawing near; that she then appealed to the captain of said vessel, but obtained no substantial justice or protection; that on reaching Doboy, a port within this district, and having previously tendered the customary fare, which had been declined, the purser insisted that she should ride on the lower deck or that he would have her put off. Under these circumstances, and libellant not deeming the lower deck a fit place to occupy, and not desiring to be ejected from the steamboat with violence, yielded to the forced alternative, and with the child went out upon the wharf at Doboy and was compelled to remain there nearly six hours, when she was taken off by a passing steamer, and reached Savannah the next day; and by reason of said officers not allowing her to enjoy and receive the benefits of a first-class passage upon said boat, and by reason of their not performing their duties to carry her safely and properly, she has been damaged one thousand dollars. And also, that by reason of said illegal and unjustifiable actions of the said officers, and the manner in which she was forced to leave said steam-

boat, and the pain, indignity and humiliation thus done to, and inflicted upon her, she has suffered damage to the amount of two thousand dollars, in addition to the damages hereinbefore referred to, etc.

The answer of Lawrence, the claimant and agent, denies that libellant was entitled to the accommodations or particular privileges claimed by her, or that the lower deck was an unfit place for her to occupy as a passenger, but admits that the purser did tell her to go to the lower deck; that the purser gave her the option to accede to the rules and regulations or to go ashore at Doboy; that she went ashore there of her own volition and without paying any fare; that the rules and regulations of the boat, for the protection of passengers, and for the separation of the white and colored passengers, were reasonable and necessary for the prosecution of the business of the boat; that the upper deck and the cabin thereon were used solely by, and exclusively appropriated for white passengers, and the lower deck and cabin assigned for colored passengers and respectable people; and that these regulations were known to libellant at that time; that the lower cabin and deck were well ventilated, the state-rooms perfectly private and well fitted up, and the accommodations good and ample; that the accommodations offered to her, and which would have been provided for her, but for her own conduct in insisting to ride on the upper deck, were good, ample and sufficient for her, and all she had a right to expect or demand. Another reason given by respondent for the purser's telling her to leave the upper deck, was that he had been informed by a passenger that she was a person of immoral character. But the evidence adduced, legally viewed, does not sustain this averment. Neither does it show any defamatory intention on his part. Therefore, I leave this matter entirely out of view in deciding the cause. I may remark that I find no material discrepancy between the answer of Lawrence and the testimony of Richardson, the purser.

The libellant testified that while on the upper deck aft, the purser asked her if she had a ticket; she said "No;" that he then told her she must go down stairs and ride with the other colored people; that from this order she appealed to the captain, but without success; that she tendered the purser the fare, five dollars, but he declined it, telling her that the rules of the boat forbade her riding on the upper deck or in the upper cabin, for they were appropriated exclusively for the white passengers, and that if she did not go down stairs he would put her off at Doboy; that, declining to obey the order, on the arrival of the boat at Doboy she asked the purser if he meant to put her ashore, and he said "Yes;" that then she went ashore and remained there some five hours, and then took another boat for Savannah. On her cross-examination she said: "I demanded

to ride in the same cabin with the white people and on the same deck, and demanded the same and equal accommodations which the white people enjoyed, with the exception of going to the first table. * * * I insisted on riding up stairs in that cabin, and the purser insisted that if I did he would put me ashore at Doboy; I went ashore because I was afraid, from the way he spoke to me, that he would put me off, and having my nephew I was afraid one or the other of us would fall overboard. Nobody laid hands on me to put me ashore. * * * I did not ask him if he could furnish me a state-room down stairs, nor did I care whether he could or not, as I was unwilling to ride on the deck when out of my state-room. I would have refused any state-room he offered me down stairs, unless he would have allowed me to ride up stairs; by up stairs I mean the cabin, which the purser told me was allotted to white people. There were plenty of white passengers on board. I know the reason I went ashore at Doboy; it was because I insisted on riding in the cabin up stairs, and the purser would not allow me to do so. But for that refusal I would not have gone ashore at Doboy."

Lawrence, the claimant and agent, testified that there are two other decks and cabins besides the one referred to by libellant in her testimony; one deck, or a portion of it, is for deck passengers; on the other deck are four state-rooms, which are generally set apart for colored passengers, but when there are none, and the boat is crowded, white passengers are placed in them; that if libellant had been content with these accommodations she could have had a state-room. These, he states, are perfectly private and convenient, and the fare from Darien to Savannah is five dollars for first-class, white or colored passengers. That in the cabin set apart for colored passengers, no one is allowed to ride except those who have first-class tickets and are colored, unless no colored passengers occupy that deck, and the boat is crowded, as stated; that the fitting up of these state-rooms is equally as comfortable as that in the upper cabin, the painting the same, carpets not as comfortable as in the white cabin, but the bedding is exactly the same in both cabins.

The testimony of Fleetwood, the master of the steamboat, is of like purport and effect as that of Lawrence. The master also testified the libellant while on board, was noisy and exhibited much passion; that she had been playing on the piano, waltzing around the cabin, and making herself generally conspicuous, and that when she was going ashore at Doboy he saw and heard her threatening the purser, and daring him to come out on the wharf, saying what she would do with him. And the purser swears that libellant was not, to his knowledge, treated rudely or roughly while on board, and that it was his purpose to get along pleasantly with her. The libellant swears that she was treated by the purser rudely and harshly, not decently or respectfully. "He used no abusive language to me, with the exception of the tone of his voice, just as if I was a brute or something. The way he treated me as a brute was, he came to the passengers and collected the fare politely and turned to me and said, 'Say, have you a ticket?' and I said, 'No, but here is the money.' And he said. 'Go down stairs, or I will put you off at Doboy.' "

If, indeed, there is any imperfection in the laws regulating commerce among the states, more especially—looking to the controversy under consideration by this court—in regard to the transportation of white and colored passengers in the same cabin or apartment of steamboats, or other public conveyances engaged in inter-state commerce, then this "inaction" (by congress), as was said by Mr. Justice Field, speaking for the court, in Welton v. State, 91 U. S. 275, "is equivalent to a declaration that inter-state commerce shall remain free and untrammelled," and as it has not thought proper to declare that steamboats enrolled and licensed to ply between ports and places of the several states shall be compelled to carry white and colored passengers in the same cabins and staterooms, this court must turn to the common law to ascertain whether the rule of the proprietors or officers of this vessel, the City of Bridgeton, in requiring colored passengers to occupy separate cabins, saloons and state-rooms from those assigned to white passengers, is a reasonable regulation and one, which of right, the common carrier may prescribe and enforce. The right of a passenger to a passage on board of a steamboat is not an unlimited right. The passenger is bound to obey the orders and regulations of the proprietors, unless they are oppressive and grossly unreasonable. Whoever goes on board under ordinary circumstances impliedly contracts to obey such regulations, and may justly be refused a passage if he or she willfully resists or violates them. The City of Bridgeton was held out to the world as a common carrier of passengers, for hire, consequently free to all proper persons who sought transportation to ports or places agreed on within the termini of her route. But the vessel being thus open to passengers did not strip the owners or master of the right to make such suitable regulations as would promote the interests of the owners, and preserve order and decorum. Nor, on the other hand, could the proprietors, or master, be required to put passengers in the same cabin or stateroom, who would be repulsive or disagreeable to each other. See Hall v. De Cuir, 95 U. S. 504. In West Chester & P. R. Co. v. Miles, 55 Pa. St. 209, the court decided that a common carrier may separate passengers in his conveyance, and that it was not an unreasonable regulation, for it prevented contacts and collisions arising from natural and well known repugnances, which

are likely to breed disturbances where white and colored persons are huddled together without their consent.

In the recent case [of Bertonneau] against the board of directors [Case No. 1,361], published in the Atlanta Constitution, of February 26, 1879, and which involved the question as to whether colored children were entitled, as a matter of right, to be educated in the same school with white children, the United States circuit court for Louisiana answered the question in the negative. Said Mr. Justice Woods, in delivering the opinion of the court: "Equality of right does not involve the necessity of educating children of both sexes or ages in the same school. Any classification which presumes substantially equal school advantages, does not impair any rights, and is not prohibited by the constitution of the United States. 'Equality of rights does not necessarily imply identity of rights.'" In Hall v. DeCuir, 95 U. S. 485, in error to the supreme court of Louisiana, Benson, the master of a steamboat, had refused a colored passenger, Mrs. DeCuir (the plaintiff below), the privilege of the cabin set apart for white passengers, notwithstanding the law of Louisiana had declared that common carriers of passengers should make no discrimination on account of race or color. Chief Justice Waite, in delivering the opinion of the supreme court of the United States, said that: "Congressional inaction left Benson at liberty to adopt such reasonable rules and regulations for the disposition of passengers upon his boat while pursuing her voyage within Louisiana or without as seemed to him most for the interest of all concerned. * * * We think this statute, to the extent that it requires those engaged in the transportation of passengers among the states to carry colored passengers in Louisiana in the same cabin with whites, is unconstitutional and void. If the public good requires such legislation, it must come from congress, and not from the states." And Mr. Justice Clifford, in a concurring opinion, said: "It is clear that a steamer carrying passengers may have separate cabins and dining saloons for white persons and persons of color, for the plain reason that the laws of congress contain nothing to prohibit such an arrangement."

The steamboat City of Bridgeton, like all vessels engaged in transporting passengers for hire between the several states, is ranked as a portion of the national marine, and consequently within the governing power of the national legislature. Congress has not deemed it necessary or essential to the welfare of the colored citizen to enact any law forbidding inter-state common carriers, by water or land, from regulating the business of their vessels or vehicles in such manner that the accommodations for colored passengers on their respective conveyances, may be distinct and separate from those assigned to white passengers, yet colored passengers are entitled to accommodations as suitable as those designated for the exclusive use of white passengers. And I am of opinion, upon perusal of the evidence adduced, that the cabin and state-rooms reserved for colored passengers on the City of Bridgeton were substantially equal to those from which the libellant was excluded by the rules and regulations of the boat; and these, so far as they were enforced, were reasonable and highly proper, imposing neither burdensome nor impossible conditions on libellant. And as to the other question for decision, namely: the alleged illegal and unjustifiable manner in which the libellant was, as she says, forced to leave the boat, and the pain, indignity and humiliation inflicted upon her by the officers of the boat, this must be determined by the simple weight of evidence as in other civil cases, and thus guided, my judgment is that she has failed to establish her asserted grievances and mental sufferings. It is therefore ordered, adjudged and decreed that the libel be dismissed with costs, to be taxed by the clerk.